UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

William Indelicato,

                        Plaintiff,

    v.

Liberty Transportation, Inc.,

                        Defendant.

**Report and Recommendation**

18-CV-253V

---

## I. INTRODUCTION

Plaintiff William Indelicato responded to an online advertisement from defendant Liberty Transportation, Inc. seeking New York truck drivers to help with manifests for various shipping loads. Plaintiff eventually leased a truck from defendant and entered an independent contractor agreement to accept manifests at his discretion. Between February 2017 and March 2018, plaintiff hauled 167 loads for defendant and was paid biweekly for manifests completed. Over time, plaintiff grew unhappy with how much defendant was deducting from his paychecks for expenses set forth in his independent contractor agreement. In short, plaintiff came to believe that the deductions improperly left his pay below federal and state minimum-wage requirements.

Plaintiff brought suit here alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, and Article 6 of the New York Labor Law (the "Labor Law"), N.Y. Lab. Law §§ 190–199-a. Defendant now has filed a motion to dismiss the complaint for lack of personal jurisdiction, under Rule 12(b)(2) of the Federal Rules of Civil Procedure ("FRCP"). Defendant argues that it has insufficient general or specific contacts with New York to maintain personal jurisdiction, considering its Pennsylvania location and incorporation; plaintiff's independent contractor status; and the small percentage of its overall business that has connections to New York;

among other factors. Plaintiff argues that the Court can exercise personal jurisdiction over defendant, considering defendant's efforts to recruit more New York drivers and considering the number of manifests that he accepted that had some connection to New York, also among other factors.

District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 11.) The Court held oral argument on July 12, 2018. (Dkt. No. 18.) For the reasons below, the Court respectfully recommends granting defendant's motion.

## II. BACKGROUND

This case concerns allegations that defendant deducted too much from plaintiff's pay, causing plaintiff's pay to fall below the minimum wage and to violate both the FLSA and the Labor Law. Plaintiff is a resident of New York. Defendant is a Pennsylvania corporation with its principal place of business in Pennsylvania. Defendant is a trucking "dispatching Company that seeks out Shippers needing Independent Contractor services being provided as a common and / or contract carrier by motor vehicle." (Dkt. No. 9-1 at 8.) For the sake of brevity and consistent with Rule 12, the Court recites the following background information in the light most favorable to plaintiff, without further use of the word "alleged."

### A. *Plaintiff responds to an ad and signs a contract*

The relationship between plaintiff and defendant began around February 2017. Defendant posted an advertisement online seeking one or more truck drivers in New York. Plaintiff responded to the advertisement and communicated with defendant about the job. Defendant was interested in hiring plaintiff because he lived in New York and held a New York driving license; defendant wanted to increase its business with Canadian customers by developing a regular route across the Peace Bridge in Buffalo. (Dkt. No. 13-2 at 2.) The communications led to the parties entering two

2

separate agreements; plaintiff asserts that he signed the necessary documents at his home in New York. Since plaintiff did not own his own truck, he entered a Monthly Vehicle Lease Agreement to lease a truck from defendant. (*Id.* at 7.)[1] Among other provisions, the lease agreement contained this language in a section titled, "Deductions":

> Lessee [*i.e.*, plaintiff] agrees to permit and does permit Landmark to accept automatic payments for any items under this Agreement (including, but not limited to, lease payments, maintenance, registration fees, and insurance payments), directly from Lessee's employer, contractor, carrier, or anyone making payment to Lessor for services where Lessee uses the leased "vehicle." The purpose of this paragraph is to insure that the Lease payment is guaranteed as a primary payment before any other costs or expenses paid by Lessee.

(*Id.* at 11.) The parties also entered a Contractor Agreement that set up plaintiff as an independent contractor who could accept shipping manifests from defendant's dispatchers. (Dkt. No. 9-1 at 8.) Among other provisions of this agreement, plaintiff had discretion to accept or to refuse available manifests (*id.* at 10), though his discretion was somewhat limited by the need to take enough work to meet his lease payments (Dkt. No. 13-2 at 11). Plaintiff agreed "to pay all direct costs and expenses incidental to the operation of the Contractor's vehicles and employees if and when utilized and committed by Contractor. (This includes, but is not restricted to, drivers, helpers, oil, fuel, tolls, repairs, ferries, liability insurance, Workers' Compensation insurance premiums, any State Unemployment Compensation premiums, all assessments, penalties, phone calls, road and fuel taxes, registrations, permits, and fines for traffic violations.)" (Dkt. No. 9-1 at 10.) Defendant would pay plaintiff for each manifest upon completion, subject to deductions that plaintiff authorized. (*Id.* at 11.) The Contractor Agreement specified that payments to plaintiff "are not to be construed as pay / wages, but are paid as Contract settlement payment for the services performed pursuant to this

---

[1] The copy of the lease agreement that the Court has is not fully signed. For Rule 12 purposes only, the Court notes that the parties do not appear to be contesting that they signed and fully executed a lease agreement substantially identical to the copy that the Court has.

Agreement." (*Id.* at 14.) Finally, the Contractor Agreement contains the following choice-of-law provision: "Any interpretation or enforcement of this Agreement shall be exclusively in the Court of Common Pleas of Westmoreland County applying the Laws of the Commonwealth of Pennsylvania." (*Id.* at 16.)

On March 24, 2017, plaintiff picked up his truck in Pennsylvania. Around that time, defendant informed plaintiff that he had to incorporate as a condition of employment. (Dkt. No. 13-2 at 3.) Plaintiff opened a sole proprietorship and began the process of incorporating as a New York limited liability corporation. (*Id.*) For reasons not disclosed in the record, plaintiff never finished the creation of the limited liability corporation. (*Id.*)

### B. Defendant's deductions from plaintiff's pay

The full extent of the relationship between plaintiff and defendant is not clear, but the record provides some clues. Plaintiff accepted a total of 167 manifests until March 2018. (*Id.* at 4; Dkt. No. 17-1 at 5–12.) Of the manifests that plaintiff accepted, some originated in New York, some ended in New York, some passed through New York, and others had nothing to do with New York. (Dkt. No. 13-2 at 4; Dkt. No. 17-1 at 5–12.) By plaintiff's estimates, a majority of his manifests originated in New York with an additional percentage of manifests ending in New York.[2] (Dkt. No. 13-2 at 4.) Some of plaintiff's New York manifests were regular biweekly arrangements. (*Id.*)

The problems that arose between plaintiff and defendant concerned the nature of the deductions to which plaintiff had agreed. Plaintiff has not provided all of his payment statements, but he has provided one that he considers a sample. (*Id.* at 28.) The sample payment does not

---

[2] Although the Court is construing all facts in the light most favorable to plaintiff for Rule 12 purposes, it will note defendant's documentation of every load that plaintiff hauled for a manifest. (Dkt. No. 17-1 at 5–12.) The Court will address this documentation in more detail later.

specify the origin, route, or destination for the manifest that led to the payment. Nonetheless, plaintiff points to the sample payment to show the severity of the deductions that defendant was making. On the face of the sample payment, defendant paid an "independent contractor settlement" in the gross amount of $5,159.19. Under the gross pay amount follow a series of deductions whose abbreviations are not obvious but that appear to represent deductions for items like insurance, maintenance, fuel, and commercial trucking plates. By the time defendant finished making deductions, plaintiff had a net pay of $919.59. The sample payment also includes some year-to-date information. For the calendar year 2017 through June 16, 2017, plaintiff had a gross pay of $39,363.87 and a net pay of $11,392.02. The record does not make clear to what extent plaintiff and defendant discussed the amount of the deductions before plaintiff resorted to litigation. The record as a whole, however, makes apparent that plaintiff grew unhappy with the amount of the deductions and with the amount of net pay that he wound up taking home.

### C. This litigation

Plaintiff commenced this case by filing a complaint, with potential collective and class action claims, on February 16, 2018. (Dkt. No. 1.) The heart of plaintiff's complaint is his concern that the payment deductions that defendant subtracts from gross pay are large enough to implicate the FLSA and the Labor Law:

> Defendant makes substantial deductions from the paychecks of Plaintiff and other drivers. These deductions are for the sole benefit of Defendant and include items such as insurance, vehicle lease payments, vehicle maintenance payments, fuel, on board recording device (which the Defendant uses to track the every move of its drivers), occupational accidental insurance (workers' compensation insurance), and other miscellaneous expenses.
>
> These deductions can be so significant that they sometimes result in Plaintiff and other drivers being paid an hourly wage that falls below the minimum wage required by the FLSA ($7.25 during all relevant times) and the NYLL (ranging from $7.25 to $15.00 during the relevant six-year period and depending on work location). For example, during the two-week period ending on February 3, 2018, Defendant

5

subjected Plaintiff to the following deductions: $1,868.45 for fuel; $343.82 for insurance; $728.04 for the truck lease; $260.59 for vehicle maintenance; $17.00 for the on board recording device lease fee; and $76.00 for workers' compensation insurance. In the wake of these deductions, Plaintiff was left with only $358.46 in pay for a two-week period in which he worked approximately 70 hours.

(Dkt. No. 1 at 3–4.) Consequently, the complaint contains three claims or counts. In Count I, plaintiff accuses defendant of paying below the minimum wage required by the FLSA. In Count II, plaintiff accuses defendant of paying below the minimum wage required by the Labor Law. In Count III, plaintiff accuses defendant of wage deductions that violated the Labor Law. Plaintiff intends to seek a collective action under the FLSA for "all United States residents who, during any time within the past three years, worked for Defendant as drivers and purportedly worked as non-employee contractors." (*Id.* at 4.) Plaintiff additionally intends to seek a class action under the Labor Law for "all New York residents who, during any time within the past six years, worked for Defendant as drivers and purportedly worked as non-employee contractors." (*Id.*)

Defendant filed its motion to dismiss on May 23, 2018. Defendant argues that personal jurisdiction cannot arise under New York's long-arm jurisdiction statute:

> Based on the totality of the circumstances, Liberty cannot be subject to personal jurisdiction in New York. Indelicato's claims arise from his agreement to provide equipment and driving services for Liberty. Compl., ¶ 8. Indelicato and Liberty negotiated and signed the Contractor Agreement in Pennsylvania. Runzo Decl., ¶ 10. No employee of Liberty ever traveled to New York regarding Indelicato's agreement or that of any other contractor. *Id.*, ¶ 18. In addition, the Contractor Agreement Indelicato signed with Liberty includes a choice-of-law clause requiring that all disputes related to the interpretation or enforcement of the agreement be brought in Pennsylvania. *Id.*, ¶ 11, Attachment 1, § 25. Moreover, Liberty's drivers perform an insignificant amount of driving through the state of New York and rarely deliver into the state. *Id.*, ¶¶ 15, 16. Indelicato himself spent the vast majority of his time performing work outside the state. *Id.*, ¶ 17. Liberty has no property or employees in New York and makes all business decisions from its headquarters in Pennsylvania. *Id.* ¶¶ 8, 14. Thus, there is no basis for this Court to exercise personal jurisdiction over Liberty.

(Dkt. No. 9 at 7.) Defendant also distinguishes the New York contacts that plaintiff has highlighted

6

as his own contacts with New York, not its contacts with New York. (Dkt. No. 17 at 3.) With respect to any analysis under the Due Process Clause, defendant asserts that it does not have the necessary contacts with New York to establish general jurisdiction:

> Plaintiff does not—indeed, he cannot—allege that Liberty is incorporated or domiciled in New York or is otherwise "at home" in the state. Liberty is a Pennsylvania company with its principal place of business in Pennsylvania. Runzo Decl., ¶¶ 3, 4. Liberty maintains no property or employees in New York. *Id.*, ¶ 8. Less than 1% of the dispatched miles traveled by all Liberty contractors occur in New York. *Id.*, ¶ 16. Although Liberty is registered to do business in New York, that alone is not enough to subject it to general jurisdiction. *See Brown*, 814 F.3d at 629, 641 (a corporation's contacts in a state for general jurisdiction purposes must be assessed not in isolation but in the context of the company's overall activity, and merely registering to do business or appointing an agent for service of process is insufficient); *Spratley v. FCA US LLC*, No. 317CV0062MADDEP, 2017 WL 4023348, at *4 (N.D.N.Y. Sept. 12, 2017) ("after Daimler, registration to do business in New York does not amount to consent to general jurisdiction"). There is no question that Liberty is not subject to general jurisdiction in New York.

(*Id.* at 9; *see also* Dkt. No. 17 at 7 (asserting 145,228 miles in New York for defendant's contractors in 2015, out of a total of nearly 20 million miles driven that year).) In a similar way, defendant argues against specific jurisdiction as well:

> For the same reasons this Court may not exercise personal jurisdiction under New York's long-arm statute, it may not exercise such jurisdiction under the Due Process Clause—doing so would offend "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. Liberty contracted with Indelicato in Pennsylvania to perform services across the country. Runzo Decl., ¶¶ 10, 12. All contacts between Liberty and Indelicato occurred in Pennsylvania, and the agreement Indelicato signed specifically selected Pennsylvania law to apply to it. *Id.*, ¶¶ 10, 11, 13, 14. Liberty does not have the minimum contacts with New York required to subject it to the specific personal jurisdiction of this Court for Indelicato's wage claims.

(Dkt. No. 9 at 10.)

Plaintiff opposes defendant's motion for several reasons. Plaintiff argues in favor of the necessary minimum contacts between defendant in New York by reciting the advertising targeting job applicants in the Buffalo area; defendant's desire to have a New York route that would increase

7

Canadian business; the signing of documents in New York; the requirement to create a limited liability corporation in New York; the numerous manifests that started, ended, or passed through New York; and the delivery of pay stubs or violation notices to plaintiff's home in New York. (Dkt. No. 13 at 1–2.) Plaintiff then provides more specific details about the circumstances of his work:

> Here, there is no dispute that Liberty has purposefully transacted business in New York. In this regard, the Court is referred to the facts described in Section I supra and the accompanying exhibits. As indicated, Liberty:
>
> - is registered to do business in New York;
>
> - obtained insurance in New York;
>
> - has contracted with around 10 New York drivers;
>
> - logged 145,228 miles of New York travel in a 2-year period;
>
> - has been cited in New York on 17 separate occasions for 34 safety violations involving 14 separate truck tractors and 15 separate semi-trailers;
>
> - employs a Dispatcher who purports work in the "Greater New York City Area";
>
> - regularly picks-up and drops-off delivery loads at New York facilities owned by New York customers;
>
> - has sent executives (including Senior Vice President Runzo) to New York to meet with vendors;
>
> - advertised for driver openings in the Buffalo, New York area;
>
> - actively recruited Plaintiff for a New York-based job and sent contracts to his New York home; [and]
>
> - signed contracts that Plaintiff had already executed at his New York home.

(*Id.* at 6.) Plaintiff additionally argues that, for purposes of the FLSA and the Labor Law, he should be considered a statutory employee and not an independent contractor:

> Moreover, there is a substantial relationship between Liberty's above-described New York activities and Plaintiff's specific claims in this lawsuit. Here, Plaintiff asserts that, even though he signed an independent contractor agreement, he should be considered a statutory employee under the New York Labor Law and FLSA because, *inter alia*, Liberty controlled and monitored his work. *See* Complaint (Doc. 1) at ¶¶ 9, 27, and 31. As such, the independent contractor agreement that Liberty sent to Plaintiff's New York home and that Plaintiff signed in his New York home will play an important role in this lawsuit. Also, in determining the extent of Liberty's control over Plaintiff's work, the factfinder will be required to analyze the relationship between Liberty and Plaintiff with respect to the work that Plaintiff performed in New York state. As just one of many examples, Liberty fined Plaintiff $75.00 for alleged violations found against Plaintiff during a safety inspection of his vehicle in New York in May 2017. *See* Exhibit E. Liberty's purported control over Plaintiff is further evidenced by Plaintiff's allegation that Liberty unilaterally dictated the customers he serviced and the loads that he picked-up and dropped-off.

(*Id.*)

## III. DISCUSSION

### A. Rule 12(b)(2) motions to dismiss generally

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (citation omitted). "In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion. If the court chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials. Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d

9

Cir. 1981) (citations omitted). "Those documents [*i.e.*, submitted in the prima facie showing] are construed in the light most favorable to plaintiff and all doubts are resolved in its favor." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (citation omitted).

### B. Personal jurisdiction generally

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). "This is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Walden v. Fiore*, 571 U.S. 277, 134 S. Ct. 1115, 1121 (2014) (internal quotation marks and citation omitted). State law will determine the outermost boundaries here as well; the parties have not pointed out any provision of the FLSA that would address those limits. With respect to state law, "[f]or a court to exercise general jurisdiction over a defendant, 1) state law must authorize general jurisdiction; and 2) jurisdiction must comport with constitutional due process principles." *Reich v. Lopez*, 858 F.3d 55, 62 (2d Cir.), *cert. denied*, 138 S. Ct. 282, 199 L. Ed. 2d 127 (2017) (internal quotation marks and citation omitted). New York has a statute that authorizes general jurisdiction. *See* N.Y. CPLR 301; *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 565 N.E.2d 488, 490 (N.Y. 1990) ("A foreign corporation is amenable to suit in New York courts under CPLR 301 if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted.") (citations omitted). Whether general jurisdiction exists here thus reduces to the question of whether that reach would violate federal constitutional due process principles.

"Constitutional due process assures that an individual will only be subjected to the jurisdiction of a court where the maintenance of a lawsuit does not offend traditional notions of fair

play and substantial justice." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 328 (2d Cir. 2016), *cert. denied sub nom. Sokolow v. Palestine Liberation Org.*, 138 S. Ct. 1438 (2018) (internal quotation marks and citation omitted). "Even when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its in personam jurisdiction when there are sufficient contacts between the State and the foreign corporation." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (citations omitted). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (citation omitted); *see also Daimler AG*, 571 U.S. at 137 ("With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction.") (internal quotation and editorial marks and citations omitted). The phrase "paradigm forum" does not necessarily mean the only way to establish general jurisdiction. *See BNSF Ry. Co. v. Tyrrell*, \_\_\_ U.S. \_\_\_, 137 S. Ct. 1549, 1558 (2017) ("The exercise of general jurisdiction is not limited to these forums; in an 'exceptional case,' a corporate defendant's operations in another forum may be so substantial and of such a nature as to render the corporation at home in that State.") (internal quotation marks and citation omitted). Nonetheless, the Supreme Court has found only one such "exceptional case" in the last 70 years. *See generally Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952) (temporary relocation of a corporation from the Philippines to Ohio made Ohio the center of corporate activity). Corporate activity in a state that constitutes only 5–10% of overall corporate activity does not suffice. *See BNSF*, 137 S. Ct. at 1554. Sales activity, a regional office, and a subsidiary relationship to another corporation are not enough. *See Daimler AG*, 571 U.S. at 139 ("Here, neither Daimler nor MBUSA is incorporated in California, nor does either entity have its

11

principal place of business there. If Daimler's California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which MBUSA's sales are sizable."). Combining sales, employment, and a physical presence in a state will not create general jurisdiction. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 628 (2d Cir. 2016). Media and lobbying activities are not enough, either. *See Waldman*, 835 F.3d at 333.

With respect to specific jurisdiction, "New York decisions . . . at least in their rhetoric, tend to conflate the long-arm statutory and constitutional analyses by focusing on the constitutional standard: whether the defendant's conduct constitutes purposeful availment of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 247 (2d Cir. 2007) (internal quotation and editorial marks and citations omitted).

"In order for a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State. When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, ___ U.S. ___, 137 S. Ct. 1773, 1781 (2017) (internal quotation and editorial marks and citations omitted). "As a rule in these cases, [the Supreme Court] has inquired whether there was some act by which the defendant purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Goodyear*, 564 U.S. at 924 (internal quotation and editorial marks and citations omitted). The analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 134 S. Ct. at 1122 (citations omitted). In the

12

Second Circuit, "[t]hat analysis involves a consideration of the relationship among the defendant, the forum, and the litigation. Where the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts. Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury." *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998) (internal quotation marks and citations omitted).

### C. Personal jurisdiction as applied here

With the general principles of personal jurisdiction in mind, the Court now turns to the specific circumstances present here. Defendant is not incorporated in New York, and it does not have a principal place of business here. Defendant has no assets in New York. *Cf. Rates Tech. Inc. v. Cequel Commc'ns, LLC*, 15 F. Supp. 3d 409, 417 (S.D.N.Y. 2014) ("Moreover, the lack of an office, employees, bank accounts, or property in the forum is significant."). Defendant's trucking business in New York is neither a majority nor a substantial plurality of its overall business. *Cf. Ontel Prod., Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144, 1147 (S.D.N.Y. 1995) (finding personal jurisdiction over an out-of-state defendant where "fully eighty percent of all nationwide orders are fulfilled by" the local independent contractor). Plaintiff was an independent contractor with no authority to bind defendant. *Cf. Top Form Mills, Inc. v. Sociedad Nationale Industria Applicazioni Viscosa*, 428 F. Supp. 1237, 1249 (S.D.N.Y. 1977)(finding personal jurisdiction where defendant's agent "was authorized under certain circumstances to confirm contracts in New York for Avandero's [a freight forwarding agency] services. He received copies of all documents and correspondence relating to individual shipments by Avandero, acted as Avandero's New York overseer of these shipments, and answered

13

or processed complaints from customers. On occasion he collected payments due Avandero.").
That plaintiff might have signed his agreements in New York is not a significant factor and would have been offset by the completion of arrangements in Pennsylvania to pick up the leased truck. *Cf. Lane v. Vacation Charters, Ltd.*, 750 F. Supp. 120, 124 (S.D.N.Y. 1990) ("Defendant's unrefuted evidence indicates that [a non-party acting for plaintiff] initiated contact with the defendant and travelled to Philadelphia for negotiations. The contract was only mailed to her in New York for signature. At no time did defendant's employees travel to New York to conduct business. Moreover, [the non-party] cannot be seen as defendant's agent in this transaction."). Plaintiff had discretion to accept or to reject manifests as he wished. When he did accept manifests, plaintiff's duties did not include soliciting further business or making other logistical arrangements for defendant. The record is not clear as to exactly how defendant would go about seeking new business opportunities, but anything that it did in that regard did not involve plaintiff or New York very much if at all. *Cf. Riviera Trading Corp. v. Oakley, Inc.*, 944 F. Supp. 1150, 1156 (S.D.N.Y. 1996) ("It is not enough that an independent contractor is present in New York, systematically soliciting business for the corporation, no matter how substantial the orders.") (internal quotation and editorial marks and citations omitted); *see also Williams v. Preeminent Protective Servs., Inc.*, 81 F. Supp. 3d 265, 269 (E.D.N.Y. 2015) (prima facie showing made where "Plaintiff was expected to be available to defendants at all times, and was provided with a company-owned laptop, cellphone, and internet hotspot for that purpose. Plaintiff's duties included coordinating communications between Preeminent's central office and hundreds of its field employees via a text-messaging system she implemented and operated from her home.").

The nature of plaintiff's manifests, alone or in conjunction with other factors that plaintiff has cited, does not change the circumstances that the Court discussed above. As noted earlier,

14

defendant in its reply papers attached a complete list of all 167 manifests that plaintiff accepted during the time when he worked for plaintiff. (Dkt. No. 17-1 at 5–12.) Defendant assessed the list of manifests to conclude that plaintiff "incurred less than 10% of his miles in New York." (Dkt. No. 17 at 5.) To give plaintiff the benefit of the doubt for Rule 12 purposes, the Court has examined the list of manifests a little differently. The Court agrees with defendant that 49 manifests started or ended in New York. For an additional 34 manifests, however, the route began on one side of New York—states such as Pennsylvania, Nebraska, or Oklahoma—and ended in a New England state such as Connecticut or Massachusetts. Taking judicial notice of the geographical necessity of passing through New York to reach New England states from Pennsylvania or points farther west, the Court added these 34 manifests to the other 49 for a total of 83 manifests out of 167 that required at least some contact with New York. Additionally, if the Court generously gave plaintiff the benefit of the doubt and counted all of the mileage for those 83 manifests as mileage that had something to do with New York at some point then the total would amount to 33,659.1 miles out of 85,658, a rate of about 39 percent. The Court's calculations come closer to plaintiff's informal estimates. Yet even with these more generous numbers, plaintiff has not shown that his New York business amounted to more than a small percentage of the millions of miles that defendant claims as its annual business. *Cf. JetBlue Airways Corp. v. Helferich Patent Licensing, LLC*, 960 F. Supp. 2d 383, 394 (E.D.N.Y. 2013) (dozens of licensing agreements worth millions of dollars "are sufficient to permit an exercise of general personal jurisdiction").

    Consequently, all of the above factors[3] push the Court to conclude that plaintiff has not

---

[3] Because the above factors suffice to establish a lack of personal jurisdiction, the Court does not see the need to address questions surrounding the choice-of-law provision in the Contractor Agreement (Dkt. No. 9-1 at 16): whether plaintiff's claims concern the "interpretation or enforcement" of the agreement; whether a trial court in Pennsylvania could enforce plaintiff's federal and New York claims; and whether Pennsylvania law would apply to any of plaintiff's claims. If the choice-of-law provision did not apply at all then the above

made a prima facie showing of either general or specific jurisdiction. To hold otherwise "would mean that a freight forwarder is subject to suit on any cause of action in any jurisdiction to which it makes substantial shipments if, even without maintaining an office, it solicits such business there." *Aquascutum of London, Inc. v. S. S. Am. Champion*, 426 F.2d 205, 212 (2d Cir. 1970). Transfer of the case to a more appropriate district might have been an option as an alternative to outright dismissal. 28 U.S.C. § 1406(a); *see Minnette v. Time Warner*, 997 F.2d 1023, 1027 (2d Cir. 1993)(ordering transfer and noting that "the functional purpose of 28 U.S.C. § 1406(a) is to eliminate impediments to the timely disposition of cases and controversies on their merits") (citations omitted); *accord WorldCare Corp. v. World Ins. Co.*, 767 F. Supp. 2d 341, 365 (D. Conn. 2011) (citations omitted). The parties have not mentioned transfer in their papers, however, and did not raise the issue at oral argument. The Court accordingly will not address the issue further.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendant's motion. (Dkt. No. 8.)

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." FRCP 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate

---

factors still would establish a lack of personal jurisdiction. If the choice-of-law provision required bringing suit in Pennsylvania then it would be only one more factor establishing a lack of personal jurisdiction.

judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

                                             __/s Hugh B. Scott_____
                                                   Hon. Hugh B. Scott
                                                   United States Magistrate Judge

DATED: August 16, 2018